# United States Court of Appeals
## For the First Circuit

No. 12-2274

UNITED STATES OF AMERICA,

Appellee,

v.

ERIK HARAKALY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Stahl, and Thompson,
Circuit Judges.

William M. White, Jr., with whom William M. White, Jr. &
Associates was on brief, for appellant.
Jennifer H. Zacks, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

October 31, 2013

**STAHL, Circuit Judge**.  Erik Harakaly pleaded guilty to conspiracy to possess with intent to distribute methamphetamine. After finding that Harakaly was responsible for a drug quantity that triggered a ten-year mandatory minimum sentence and that he was ineligible for safety-valve relief from that minimum, the district court sentenced him to ten years' imprisonment.  Under the Supreme Court's subsequent decision in Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013), the district court erred in making the factual finding of drug quantity necessary to impose the mandatory minimum where the quantity was neither alleged in the indictment nor admitted by Harakaly at the time of his guilty plea. Nevertheless, finding the error to be harmless, and finding no merit in Harakaly's other contentions, we affirm.

## I.  Facts & Background

During the course of investigating Scott Ramsden for alleged drug distribution, the Massachusetts State Police and the Drug Enforcement Agency determined that Harakaly was Ramsden's primary supplier of methamphetamine.  On August 10, 2010, law enforcement officials intercepted communications between the two that indicated that Harakaly had recently sent a shipment of drugs to a courier, Edmund Levine, for delivery to Ramsden.  Shortly thereafter, a Massachusetts state trooper stopped Levine's vehicle and found a substance in the trunk that was later determined to be 189.9 grams of 99.8% pure methamphetamine.  Levine advised

-2-

investigators that Harakaly had sent him the methamphetamine with directions to deliver it to Ramsden.

A grand jury returned a one-count indictment on September 23, 2010, charging Harakaly, Ramsden, Levine, and two other individuals with conspiracy to possess with intent to distribute, and to distribute, methamphetamine and gamma hydroxbutyric acid, in violation of 21 U.S.C. §§ 841(a)(1) and 846. A superseding indictment was returned on October 27, 2011, charging the same individuals, minus Ramsden, with conspiracy to possess with intent to distribute, and to distribute, methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Neither indictment specified a drug quantity. At Harakaly's arraignment on each, the government stated that the maximum sentence he faced was twenty years' imprisonment.

On January 20, 2012, Harakaly pleaded guilty without a plea agreement. When reciting the maximum penalties, the government erroneously stated that he was subject to a maximum of life imprisonment and a ten-year mandatory minimum "as charged in Count One of the indictment." However, the government promptly clarified that, because the indictment did not specify any drug quantity, the default statutory maximum would be twenty years, see 21 U.S.C. § 841(b)(1)(C), but asserted that sufficient evidence would be presented for the court to find, by a preponderance of the evidence, that Harakaly was accountable for more than fifty grams

-3-

of methamphetamine, triggering a ten-year mandatory minimum sentence, see id. § 841(b)(1)(A). When asked whether Harakaly conceded any drug quantity, defense counsel stated that he did not.

The government then summarized the evidence that it would have presented and proved beyond a reasonable doubt at trial, including: (1) Levine's admissions to investigators that Harakaly supplied the 189.9 grams of methamphetamine found in his car and that he had previously made around ten deliveries, each containing approximately five ounces of methamphetamine, to Ramsden on Harakaly's behalf, totaling approximately 1,400 grams; and (2) evidence that Harakaly was Ramsden's sole supplier of methamphetamine, and that Ramsden would send Harakaly payments, usually in the amount of $10,000, via FedEx, in exchange for methamphetamine, usually in the amount of five ounces. The court then asked Harakaly whether, as alleged by the government, he had been involved in an agreement to distribute methamphetamine, "as of yet in an undetermined quantity," through Ramsden and others. Harakaly disputed the assertion that he was Ramsden's sole supplier, but said that he otherwise agreed with the government's assertions. The court accepted his guilty plea.

Following a presentence investigation, the probation department prepared a presentence report (PSR) that estimated that Harakaly was responsible for between five and fifteen kilograms of

methamphetamine,[1] corresponding to a base offense level of 36. After a three-level increase based on the determination that Harakaly had occupied a managerial or supervisory role in the conspiracy and a three-level decrease for acceptance of responsibility, his total offense level was 36. Combined with a criminal history category of I, Harakaly's sentencing guidelines range was 188-235 months. The report also indicated that his responsibility for more than fifty grams of methamphetamine subjected him to a ten-year mandatory minimum sentence.

Harakaly made multiple objections to the PSR, disputing, among other things: (1) the accuracy of the drug-quantity calculation, arguing that he was responsible for only 1.5 to 5 kilograms of methamphetamine; (2) the applicability of the role enhancement; (3) the constitutionality under Apprendi v. New Jersey, 530 U.S. 466 (2000), of the imposition of a mandatory minimum sentence based upon a finding, by a preponderance of the evidence, of the triggering drug quantity where the quantity was neither alleged in the indictment, nor submitted to and voted on by

---

[1] This calculation was based upon: (1) forty-four FedEx receipts for shipments of $10,000 in cash from Ramsden to Harakaly in exchange for five ounces of methamphetamine (141.7 grams per shipment x 44 shipments = 6.23 kilograms); (2) Ramsden's proffer that, between January 2009 and September 2010, he purchased approximately five ounces of methamphetamine from Harakaly every two to four weeks (estimated to amount to 3.7 kilograms); and (3) Levine's statement that he had made approximately ten deliveries, of approximately five ounces of methamphetamine each, to Ramsden on Harakaly's behalf (141.7 grams per delivery x 10 deliveries = 1.417 kilograms).

the grand jury, nor admitted by him during the plea hearing; and (4) the applicability of the ten-year mandatory minimum, corresponding to § 841(b)(1)(A), where the government had continuously represented that his maximum sentence was twenty years, corresponding to § 841(b)(1)(C). He repeated these arguments in his sentencing memorandum and in two sentencing hearings, with the first, on August 6, 2012, focusing on drug quantity and the second, on October 10, 2012, focusing on the role enhancement.

At the first sentencing hearing, the district court rejected Harakaly's Apprendi argument, noting that, under the then-current state of law, Apprendi and its progeny applied only to facts that increased the penalty beyond the otherwise-prescribed statutory maximum. With respect to the notice problem raised by the government's repeated indication that it was proceeding under § 841(b)(1)(C), the court stated that Harakaly could move to withdraw his guilty plea if he believed it was not made intelligently -- an offer that he rejected. Finally, the court suggested the possibility of holding an evidentiary hearing regarding drug quantity. At that point, after conferring with counsel, Harakaly conceded responsibility for a quantity corresponding to a base offense level of 34 -- which would still

exceed the ten-year mandatory minimum triggering quantity -- with the intent of arguing for safety-valve relief.[2]

At the second sentencing hearing, the court noted that the Supreme Court was then considering whether the <u>Apprendi</u> doctrine extends to judicial findings of fact that trigger mandatory minimum sentences. After the government proffered Ramsden's testimony and various exhibits regarding Harakaly's role in the conspiracy, the district judge found, with evident reluctance, that the government had met its burden in demonstrating the propriety of a role enhancement:

> I have looked for authority. I cannot find it . . . . I do not see authority that allows me to disregard the safety valve considerations . . . . Having heard the testimony this morning and having reviewed the exhibits, and recognizing that the standard is a preponderance-of-the-evidence standard, I do not think there is any basis on which I could not [sic] conclude that Mr. Harakaly did not act as a manager . . . . I think the government's evidence probably would satisfy a reasonable-doubt standard, although I am not going to venture that opinion because, depending on what the Supreme Court does with the case currently before it, we may be revisiting this issue in the near future, again, depending on the outcome of that decision.
>
> . . . .

---

[2] Under the safety-valve provision, if the sentencing court makes five specific factual findings, it may impose a sentence below the mandatory minimum that would otherwise apply. <u>See</u> 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

> I think the sentence, again, is significantly greater than warranted under the circumstances, but, again, this is one of those cases where Congress has dictated the sentence, and I am, of course, sworn to obey the law, and I am going to have to in this circumstance.

Harakaly was sentenced to a ten-year term of incarceration followed by a five-year term of supervised release. After announcing the sentence, the court again made reference to the pending Supreme Court decision, and "specifically for the record preserve[d] [Harakaly's] right, should the Supreme Court change the law with respect to judicial fact finding regarding sentencing matters." Defense counsel affirmed that the record should so reflect. This appeal followed.

## II.  Analysis

Harakaly raises three primary arguments on appeal. He argues that the district court improperly imposed a ten-year mandatory minimum sentence under § 841(b)(1)(A) because: (1) the attributable drug quantity was not stated in the indictment, nor was it proven to a jury beyond a reasonable doubt or stipulated by Harakaly in his plea; (2) his role in the conspiracy also was not stated in the indictment, nor was it proven to the jury beyond a reasonable doubt or stipulated by Harakaly in his plea; and (3) it was error to fail to give him proper notice of the applicability of the mandatory minimum sentence where the government had repeatedly indicated that it was proceeding under § 841(b)(1)(C).

-8-

## A.        **<u>Alleyne</u> Error**

### 1.        **The <u>Alleyne</u> Decision**

When Harakaly commenced this appeal, his arguments were squarely foreclosed by Supreme Court and First Circuit precedent. In <u>Apprendi</u>, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490. However, in <u>Harris</u> v. <u>United States</u>, 536 U.S. 545 (2002), the Supreme Court distinguished facts that increase a sentence beyond a statutory maximum from facts that trigger or increase a mandatory minimum sentence.  The Court held that, where a defendant had been convicted of <u>carrying</u> a firearm in relation to a drug-trafficking offense, the district court did not err by making a factual finding that he had <u>brandished</u> the weapon, thus exposing him to a heightened mandatory minimum sentence.  <u>Id.</u> at 568.  The Court stated that "brandishing" was a sentencing factor, rather than an element of the offense, that "need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt."  <u>Id.</u>  Under <u>Harris</u>, a district court could make drug-quantity determinations, by a preponderance of the evidence, that triggered or increased mandatory minimum sentences.  <u>See, e.g.</u>, <u>United States</u> v. <u>Goodine</u>, 326 F.3d 26, 32 (1st Cir. 2003).

However, after Harakaly filed his opening brief on appeal, but before the government filed its brief, the Supreme Court handed down its decision in Alleyne. Overruling Harris, the Court held that the Sixth Amendment right to trial by jury requires that the Apprendi doctrine apply equally to facts that increase a mandatory minimum sentence.[3] See 133 S. Ct. at 2155. Therefore, Harakaly's opening argument -- that this court should reconsider its earlier cases holding that facts that increase the mandatory minimum are sentencing factors, rather than elements of the crime, that may be found by the court by a preponderance of the evidence -- has since been settled in his favor by the Supreme Court.[4]

2.     **Standard of Review**

Harakaly preserved his Alleyne claims by objecting to the imposition of a mandatory minimum sentence based upon judicial findings, by a preponderance of the evidence, of drug quantity and his managerial role. This court reviews unpreserved Apprendi errors for plain error and preserved Apprendi errors for harmless error. See United States v. Pérez-Ruiz, 353 F.3d 1, 14, 17 (1st Cir. 2003). Since Alleyne is an extension of the Apprendi

---

[3] We note that Alleyne did not reach the question of the continued vitality of Almendarez-Torres v. United States, 523 U.S. 224 (1998), in which the Court "recognized a narrow exception to this general rule for the fact of a prior conviction." Alleyne, 133 S. Ct. at 2160 n.1. Likewise, we need not do so today.

[4] Because Alleyne was decided before Harakaly's case became final, it applies to his direct appeal to this court. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987).

doctrine, the same standards should apply to Alleyne errors. Accord United States v. Hall, ___ F. App'x ___, 2013 WL 5226994, at *1-2 (11th Cir. Sept. 18, 2013) (unpublished per curiam opinion) (reviewing unpreserved Alleyne error for plain error); United States v. Hernandez, ___ F.3d ___, 2013 WL 4804323, at *5 (7th Cir. Sept. 10, 2013) (same); United States v. Mack, ___ F.3d ___, 2013 WL 4767176, at *10-12 (6th Cir. Sept. 6, 2013) (same); United States v. Baylor, ___ F. App'x ___, 2013 WL 3943145, at *13 (4th Cir. Aug. 1, 2013) (unpublished per curiam opinion) (applying harmless-error review to preserved Alleyne/Apprendi error).

In his reply brief, Harakaly suggests that the harmless-error standard does not apply because Alleyne established a constitutional error. However, he does not elaborate on this claim; it is contained entirely in a heading preceding a section that makes no mention of the standard of review an appellate court should apply to an Alleyne error, focusing instead on the reasonable-doubt standard that the district court must apply, in the first instance, to all elements of the offense. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, the Supreme Court has made abundantly clear that most constitutional errors are subject to harmless-error review; only in rare cases will they be deemed structural errors that would always require reversal. See,

e.g., <u>Washington</u> v. <u>Recuenco</u>, 548 U.S. 212, 222 (2006) (holding that preserved <u>Apprendi</u>/<u>Blakely</u> error is not structural and is subject to harmless-error review); <u>United States</u> v. <u>Cotton</u>, 535 U.S. 625, 631 (2002) (treating unpreserved <u>Apprendi</u> error as non-structural error subject to plain-error review).  In light of the long line of cases subjecting preserved <u>Apprendi</u> errors to harmless-error review, there would appear to be no basis for finding <u>Alleyne</u> error to be one of those rare cases to which harmless-error review does not apply.[5]

Under harmless-error review, because an <u>Apprendi</u> (and therefore <u>Alleyne</u>) error is of constitutional dimension, "the government must prove that the error was harmless beyond a reasonable doubt, or, put another way, that it can fairly be said beyond any reasonable doubt that the assigned error did not contribute to the result of which the appellant complains." <u>Pérez-Ruiz</u>, 353 F.3d at 17.

---

[5] We recognize that some courts have summarily vacated sentences, without any discussion of the appropriate standard of review, where there was <u>Alleyne</u> error below. <u>See, e.g.</u>, <u>United States</u> v. <u>Donovan</u>, ___ F. App'x ___, 2013 WL 4792866, at *7 (6th Cir. Sept. 9, 2013) (unpublished) (vacating sentence, with no discussion of harmlessness or plain error, based on judicial finding that firearm was discharged where jury convicted only of using firearm); <u>United States</u> v. <u>Lira</u>, 725 F.3d 1043, 1044–45 (9th Cir. 2013) (same).  With respect, absent any indication that these courts even considered the appropriate standard of review, the cases do not persuade us that a different standard should apply to <u>Alleyne</u> error than to <u>Apprendi</u> error.

### 3.    Drug-Quantity Calculation

The parties agree that, because the drug quantity that triggered the mandatory minimum sentence was not alleged in the indictment or stipulated by Harakaly at the time of his guilty plea, the district court's drug-quantity finding constituted Alleyne error.

The government argues that, in light of overwhelming and uncontested evidence that Harakaly was responsible for more than fifty grams of methamphetamine, the Alleyne error was harmless beyond a reasonable doubt.  "In drug-trafficking cases involving Apprendi errors, we sometimes have treated the presence of overwhelming evidence of the requisite drug types and quantities as a proxy for harmlessness."  Pérez-Ruiz, 353 F.3d at 18 (internal quotation marks omitted) (sentencing following jury trial); see also United States v. Morgan, 384 F.3d 1, 8 (1st Cir. 2004) (sentencing following guilty plea; noting, in dicta, that, "[i]n the post-Apprendi world, this court adopted a rule that any such error in sentencing should be held harmless so long as the evidence for the trial judge's factual findings is overwhelming and no reasonable jury could have disagreed with them").  Harakaly does not seriously contest the finding that he was responsible for more than fifty grams of methamphetamine;[6] his argument is primarily

---

[6] To the extent that he makes this argument at all, it is only in his reply brief and largely consists of challenges to the admissibility of Levine's out-of-court statements and to Ramsden's

directed to the procedure by which it was made. But the latter argument establishes only that there was Alleyne error; it says nothing about whether that error was harmless.

The evidence that Harakaly was responsible for more than fifty grams of methamphetamine was overwhelming. The delivery that the police intercepted, taken alone, was nearly four times the triggering amount. Levine told police that he had received the methamphetamine from Harakaly to deliver to Ramsden, as he had done around ten times before, estimating the total quantity to be approximately 1,400 grams. While expressly not conceding total drug quantity, Harakaly did acknowledge the accuracy of this account during the change-of-plea hearing. Leaving aside Levine's statements regarding the ten other deliveries, simply by admitting that he had provided the single shipment of drugs that police found in Levine's vehicle, Harakaly has acknowledged responsibility for a quantity of drugs that far exceeds the triggering amount. In addition, Ramsden testified under oath that Levine had made about ten deliveries of approximately five ounces (141.7 grams) each on Harakaly's behalf. He also testified that Harakaly used other

_____

credibility. While these challenges may call into question the determination that the weight exceeded five kilograms, they do little to dislodge the overwhelming evidence that he was responsible for some amount of methamphetamine in excess of fifty grams. He also argues that the government may not rely on information he gave and admissions he made during his safety-valve proffer because he was granted immunity unless he were to testify. Because that information is unnecessary to a determination of the issues herein, it has been omitted from this opinion.

couriers, besides Levine, to deliver shipments of methamphetamine to him. Ramsden stated that at least forty-three or "almost all" of forty-four FedEx receipts presented by the government were for shipments of $10,000 to Harakaly, each (aside from some smaller "test" shipments at the outset of their arrangement) representing payment for approximately five ounces of methamphetamine. Any one of these shipments far exceeds the triggering quantity.[7] Had this evidence been presented, no reasonable jury could have found that Harakaly was responsible for under fifty grams of methamphetamine. See Morgan, 384 F.3d at 8.

Harakaly's additional statements and admissions buttress this conclusion. He lodged many objections to the PSR's drug-quantity calculation, but even after accounting for all of his requested adjustments, he stated that he was responsible for 1,500 to 5,000 grams.[8] During the first sentencing hearing, he conceded

---

[7] We recognize that, where there has been Alleyne or Apprendi error and the relevant fact-finding was based solely upon co-conspirator testimony, the error may not be harmless. But, in United States v. Soto-Beníquez, we also rejected the contention that such an error could never be harmless, at least where that testimony was given to (and apparently believed by) a jury that voted to convict the defendant of participation in the conspiracy. 356 F.3d 1, 47 (1st Cir. 2004). Thus, we will consider the co-conspirator testimony as but one factor in our analysis, giving it neither dispositive weight nor no weight at all. We note, however, that, in light of the strength of the other evidence in this case, we would reach the same result even without Ramsden's testimony.

[8] For example, Harakaly admitted making the following shipments of methamphetamine to Ramsden: five or more two-ounce shipments, five or more three-ounce shipments, at least five four-ounce shipments, and an unspecified number of five-ounce shipments.

responsibility for the quantity of drugs that corresponds to a base offense level of 34, which is also 1,500 to 5,000 grams.  This court has held that there is no Apprendi violation where the fact triggering an increased maximum sentence was "anchored in the appellant's own admission."  United States v. Eirby (Eirby II), 515 F.3d 31, 36 (1st Cir. 2008).  In Eirby II, the defendant stipulated to a triggering quantity before the sentence was imposed.  Noting that "[f]actfinding premised on a defendant's admissions is not a practice invalidated by Apprendi," id., the court held that there was no error.  Here, the government concedes error, so the court need not determine whether Harakaly's concessions -- when not made as part of his guilty plea and when not in the form of a formal stipulation -- are sufficient to shield the sentence from harmless-error review altogether.  But these concessions, at a minimum, reinforce the determination that any error was harmless.[9]

Harakaly contends on appeal that his concessions were made against the backdrop of a preponderance-of-the-evidence standard and that he never conceded that the government could prove any of these quantities beyond a reasonable doubt.  This claim is unpersuasive for several reasons.  First, it is belied by the

A single two-ounce shipment is equivalent to nearly 56.7 grams, thus, by itself, triggering the ten-year mandatory minimum.

[9] We need not decide whether these concessions would independently suffice to establish harmlessness; we rely on them here only to the extent that they corroborate Harakaly's earlier concessions at his Rule 11 hearing.

-16-

record. At the change-of-plea hearing, the government indicated that its recitation would summarize what "[t]he government, were it to proceed to trial, would prove beyond a reasonable doubt with competent evidence." Although this preface could be construed to have applied only to the remainder of that sentence (that the government conducted an investigation into Ramsden's drug distribution), the far more reasonable construction is that the reasonable-doubt standard applied to the government's entire recitation. At the conclusion of this recitation, Harakaly stated that, aside from the assertion that he was Ramsden's sole methamphetamine supplier, he agreed with "in essence, everything [the assistant U.S. attorney] said." This statement was unqualified; Harakaly did not indicate that he was applying a different evidentiary standard than the one the government indicated at the outset. Nor did he make any such qualification at any other time. Second, even if Harakaly believed that he was conceding only that the government's evidence satisfied the preponderance-of-the-evidence standard, as detailed above, the evidence in this case goes far beyond his own admissions. In addition, the record would likely have been yet more robust had Harakaly not, as soon as the district court suggested holding an evidentiary hearing on drug quantity, conceded responsibility for an amount corresponding to a base offense level of 34. Of note, he made this concession with full knowledge that he would be exposed

to a ten-year mandatory minimum unless he were deemed eligible for safety-valve relief. In sum, we can find no support in the record for Harakaly's claim that he did not concede that the government could prove beyond a reasonable doubt a sufficient quantity to trigger the ten-year mandatory minimum sentence. Moreover, the admissions in his objections to the PSR and during the sentencing hearing account for only a portion of the drug-quantity evidence. Thus, we do not find his claim persuasive.

Because the evidence of the triggering drug quantity was overwhelming, we hold that the Alleyne error was harmless beyond a reasonable doubt.

### 4. Role Enhancement

Harakaly argues that the district court committed Alleyne error by making a judicial finding, by a preponderance of the evidence, that he occupied a managerial role in the conspiracy, and thus was not eligible for safety-valve relief from the mandatory minimum sentence.

Alleyne, by its terms, applies to facts that "increase[] the mandatory minimum." 133 S. Ct. at 2155. Harakaly suggests that Alleyne applies more broadly to any fact that "mandate[s] a greater punishment than a court would otherwise have had discretion to impose." We do not read Alleyne so expansively. A fact that precludes safety-valve relief does not trigger or increase the mandatory minimum, but instead prohibits imposition of a sentence

below a mandatory minimum already imposed as a result of the guilty plea or jury verdict. See United States v. Morrisette, 429 F.3d 318, 324–25 (1st Cir. 2005) ("Blakely, and by extension Booker, expressly relate only to the constitutionality of judicial factfinding which results in sentencing enhancements, not to sentencing reductions.").

Harakaly's formulation stretches Alleyne well beyond its actual holding; would invalidate Congress's command that "the court find[] at sentencing" the relevant safety-valve factors, see 18 U.S.C. § 3553(f); and introduces problematic practical considerations. Before granting safety-valve relief, the sentencing judge must make five specific factual findings. See id. § 3553(f)(1)–(5). Under Harakaly's formulation, safety-valve relief could not be denied at sentencing unless the judge had previously submitted to the jury special verdict questions corresponding to the safety-valve factors, or, in the plea context, the guilty plea expressly recited the absence of one or more factors. This arrangement would put the burden on the government to prove that the safety valve is inapplicable, but it has long been held that "[t]he defendant plainly has the burden of proving, by a preponderance of the evidence, entitlement to relief under [§] 3553(f)." United States v. Miranda-Santiago, 96 F.3d 517, 529

n.25 (1st Cir. 1996).[10] This allocation of the burden makes perfect sense; were it otherwise, the government would be required to disprove the safety-valve factors <u>before</u> the defendant ever expressed an intent to seek a sentencing reduction via the safety valve. Where the government seeks imposition of a mandatory minimum sentence, it is "perfectly able to 'charge facts upon which a mandatory minimum sentence is based in the indictment and prove them to a jury.'" <u>Alleyne</u>, 133 S. Ct. at 2164 (Sotomayor, J., concurring) (quoting <u>Harris</u>, 536 U.S. at 581 (Thomas, J.,

---

[10] The Second Circuit has articulated this rule effectively:
> The operation of the safety-valve provision does not admit to imposing on the government the burden to disprove a defendant's eligibility for relief from a mandatory-minimum sentence. Once the government has carried its burden to prove those facts which trigger imposition of a mandatory-minimum sentence, the safety valve operates to impose on the defendant the burden to prove that he is eligible for relief from the mandatory-minimum sentence. The safety valve certainly was not intended to impose on the government five additional elements that it must prove before triggering the imposition of a mandatory-minimum sentence.

United States v. <u>Jimenez</u>, 451 F.3d 97, 102–03 (2d Cir. 2006) (citations omitted).

Every circuit follows this rule. <u>See, e.g.</u>, <u>United States</u> v. <u>Polk</u>, 715 F.3d 238, 253 (8th Cir. 2013); <u>United States</u> v. <u>Henry</u>, 673 F.3d 285, 292–93 (4th Cir. 2012); <u>United States</u> v. <u>Gales</u>, 603 F.3d 49, 52–53 (D.C. Cir. 2010); <u>United States</u> v. <u>Mejia-Pimental</u>, 477 F.3d 1100, 1104 (9th Cir. 2007); <u>United States</u> v. <u>Haynes</u>, 468 F.3d 422, 427 (6th Cir. 2006); <u>United States</u> v. <u>Stephenson</u>, 452 F.3d 1173, 1179 (10th Cir. 2006); <u>Jimenez</u>, 451 F.3d at 102–03; <u>United States</u> v. <u>McCrimmon</u>, 443 F.3d 454, 457 (5th Cir. 2006); <u>United States</u> v. <u>Johnson</u>, 375 F.3d 1300, 1302 (11th Cir. 2004); <u>United States</u> v. <u>Galbraith</u>, 200 F.3d 1006, 1016 (7th Cir. 2000); <u>United States</u> v. <u>Sabir</u>, 117 F.3d 750, 754 (3d Cir. 1997).

dissenting)). The government, however, is not "perfectly able" to predict, at the time of charging, trial, or plea negotiations, what forms of relief, if any, the defendant may seek at sentencing.[11]

We thus hold that the jury verdict or guilty plea sets the baseline sentencing range based upon the minimum and maximum sentences, if any, authorized by statute for the offense of conviction. Judicial fact-finding that precludes safety-valve relief is permissible because it does not increase that baseline minimum sentence. Therefore, the district court did not commit Alleyne error in making a finding, by the preponderance of the evidence, that Harakaly occupied a managerial role in the conspiracy.

**B.      Lack of Notice in the Indictment**

Harakaly argues that, where the government repeatedly indicated that it was proceeding under § 841(b)(1)(C) by stating that the maximum incarceration penalty he faced was twenty years, the district court's imposition of the mandatory minimum sentence found in § 841(b)(1)(A) "defeats rational notice to the accused." He states that his Fifth Amendment due process and Sixth Amendment rights were "implicate[d]" when the government induced him to rely on its twenty-year representation when tendering his guilty plea,

---

[11] Moreover, one of the safety-valve factors -- whether the defendant, "not later than the time of the sentencing hearing," made a truthful and full proffer to the government, § 3553(f)(5) -- cannot, by its terms, be known at the time the jury renders its verdict or the defendant tenders his plea.

-21-

and only later, at sentencing, did "the switch occur before his eyes." This claim is flatly contradicted by the record and foreclosed by our precedent.

Before the district court accepted Harakaly's plea, the government discussed at length its intent to seek a ten-year mandatory minimum sentence and the permissibility, under then-current First Circuit case law, of judicial fact-finding with respect to drug quantity. The district court carefully explained the interaction of the sentencing guidelines and statutory mandatory minimum sentences, particularly with respect to drug quantity in conspiracy cases, and noted that the issue of drug quantity "still has to be worked out on an evidentiary basis . . . [because] it certainly does impact the sentence because of the mandatory minimum." Harakaly -- who is, incidentally, a lawyer -- subsequently confirmed that he understood what had been discussed and reaffirmed his intent to offer a guilty plea. Moreover, after raising this same claim to the district court, Harakaly was given the opportunity to move to withdraw his plea as made based upon a mistaken premise, and he did not do so.[12] Against this backdrop,

_____

[12] This decision also arguably constitutes waiver. "[T]he contours of the claim were known to [Harakaly] and identified to the court by him prior to sentencing," United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009), and he consciously and intentionally relinquished the claim by not moving to withdraw his plea at the court's suggestion, and by instead expressing the intent to seek relief from the § 841(b)(1)(A) sentence via the safety valve. "Typically, a waived claim is dead and buried; it cannot thereafter be resurrected on appeal." Id. Harakaly has presented no reason

Harakaly's claim -- that his constitutional rights were violated when he was induced to plead guilty based upon a misrepresentation as to his potential sentence, and then, only after the government had secured his guilty plea, did it spring the mandatory minimum on him -- necessarily fails.

Indeed, this result is mandated by our decision in <u>United States</u> v. <u>Eirby</u> (<u>Eirby I</u>), 262 F.3d 31 (1st Cir. 2001). There, the indictment charged the defendant under § 841(b)(1)(B), but the district court subsequently found him responsible for a drug quantity sufficient to subject him to § 841(b)(1)(A)'s ten-year mandatory minimum. <u>Id.</u> at 34-35. The defendant argued that the court's use of § 841(b)(1)(A) usurped the prerogatives of the grand jury and deprived him of notice. <u>Id.</u> at 37. We first explained that the district court's switch to § 841(b)(1)(A) "did not constitute reversible error unless it deprived the appellant of notice or otherwise misled him to his detriment." <u>Id.</u> at 38. We found neither to be the case, as the defendant was given an opportunity to withdraw his guilty plea after the district court found a higher drug quantity sufficient to trigger § 841(b)(1)(A). <u>Id.</u> The same result obtains here.

### III. Conclusion

For the foregoing reasons, we <u>affirm</u> Harakaly's sentence.

---

why his claim, if waived, should nevertheless be resurrected here. However, in light of our disposition of the claim, we need not reach the waiver issue.