# United States Court of Appeals
## For the First Circuit

———————

Nos. 10-1524, 11-1388

UNITED STATES OF AMERICA,

Appellee,

v.

GEOVANNY RAMÍREZ-NEGRÓN, a/k/a Lambe; OBED ALVARADO-MERCED,

Defendants, Appellants.

———————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

———————

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

———————

Rafael F. Castro Lang for appellant Geovanny Ramírez-Negrón.
José Luis Novas Debien for appellant Obed Alvarado-Merced.
Myriam Y. Fernández González, Assistant United States Attorney, with whom Thomas F. Klumper, Assistant United States Attorney, Rosa Emilia Rodriguez-Velez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

———————

May 9, 2014

———————

LYNCH, **Chief Judge**.  Defendants Geovanny Ramírez-Negrón ("Ramírez") and Obed Alvarado-Merced ("Alvarado") were members of a large drug trafficking conspiracy.  Ramírez was a wholesaler of cocaine, which the drug trafficking organization would process into cocaine base (more commonly known as crack).  Alvarado was a street-level seller.  Both defendants were indicted, along with 109 other members of the conspiracy; the two were charged with counts of aiding and abetting possession with intent to distribute at least one kilogram of heroin, five kilograms of cocaine, fifty grams of cocaine base, and one hundred kilograms of marijuana, all within 1000 feet of a public school, along with related conspiracy charges.  Both defendants pled guilty, agreed that the trial judge would find the relevant drug quantities for sentencing, and reserved the right to contest or appeal any drug quantities found.  After detailed evidentiary hearings, the district court sentenced each to a Guidelines sentence: Ramírez to a term of 162 months' imprisonment (a downward departure of 100 months from the bottom of the Guidelines range), and Alvarado to a term of 132 months' imprisonment (within the Guidelines range).

On appeal, Ramírez and Alvarado originally challenged the sufficiency of the evidence to support the district court's factfinding with respect to Guidelines considerations -- namely drug quantity and, for Ramírez only, leadership role.  Ramírez argued that the factfinding as to drug quantity in his case

-2-

depended entirely on unreliable hearsay and thus violated his due process rights, and that there was insufficient evidence to support a leadership finding. Alvarado argued that there was insufficient evidence to support the drug quantity finding.

After we heard oral argument, the Supreme Court issued its decision in Alleyne v. United States, 133 S. Ct. 2151 (2013). The parties submitted supplemental briefing on the impact, if any, of Alleyne, and both defendants argued that their sentences must be reversed because they were imposed by virtue of judicial factfinding by a preponderance of the evidence as to drug quantities. The defendants admit they did not raise this issue at trial or in their opening briefs on appeal.

We affirm. We hold that there was no Alleyne error at all because all elements of the defendants' crimes of conviction under 21 U.S.C. § 841(a)(1) and (b)(1)(C) were admitted as part of the guilty pleas and neither defendant was sentenced based on a mandatory minimum sentence. We also reject the defendants' respective evidentiary challenges.

I.

For purposes of these sentencing appeals, we consider the facts from the change-of-plea colloquies, the presentence investigation reports (PSRs), and the transcripts of the sentencing hearings. See United States v. Ihenacho, 716 F.3d 266, 269 (1st Cir. 2013).

-3-

The defendants belonged to a large drug trafficking ring that operated in Ponce and Juana Díaz, Puerto Rico, from at least 2003. The organization sold cocaine base, cocaine, heroin, and marijuana at several distribution points, including these: the Ernesto Ramos Antonini ("Pámpanos") Public Housing Project, El Tuque Ward, Rosaly Public Housing Project, and Salistral Ward in Ponce, as well as the Kennedy Public Housing Project in Juana Díaz.

The Federal Bureau of Investigation (FBI) and other federal agencies, working with a division of the Puerto Rico Police Department (PRPD), investigated the drug ring between November 2007 and June 2008. PRPD Agent Carlos León Acosta ("León") and other officers interviewed cooperators, made arrests and drug seizures, and conducted surveillance. The investigation covered all of the drug points, but most of the surveillance occurred at Pámpanos. While conducting that surveillance, the investigators, including Agent León, took videos of the organization's activities, ultimately capturing footage of drug dealing on 78 different days at Pámpanos.

The investigation ultimately produced evidence, including both the video footage and testimony from cooperating witnesses, that both defendants were participants in the drug ring. Ramírez, also known as "Lambe," was in charge of the distribution of all of the narcotics sold at Salistral. Ramírez was also identified as the wholesale supplier of cocaine for the entire organization by a

-4-

cooperating witness testifying before the grand jury; that testimony was later admitted during Ramírez's sentencing hearing. At the later sentencing hearing, Agent León clarified that the cocaine Ramírez supplied was "cooked" into crack. Agent León further explained that he had learned from a cooperating witness that Ramírez received all of the profits from the heroin sold at the Kennedy drug point. Ramírez joined the conspiracy no later than 2005.

Alvarado was identified as a street-level seller in the organization, dealing in crack, heroin, cocaine, and marijuana. He was seen at the distribution point at Pámpanos in surveillance videos on fifteen dates, and was filmed selling drugs on nine of those days. Alvarado was involved in the conspiracy for at least 85 days.

On May 27, 2008, a grand jury indicted Ramírez and Alvarado, along with 109 other members of the conspiracy, on seven conspiracy and drug trafficking counts. The indictment charged both with: conspiracy to possess with intent to distribute at least one kilogram of heroin, five kilograms of cocaine, fifty grams of cocaine base, and one hundred kilograms of marijuana, all within 1000 feet of a public school (Count 1); aiding and abetting in the distribution of each of those drugs and quantities listed within 1000 feet of a public school (Counts 2-5); and narcotics forfeiture (Count 7). See 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 846, 860,

-5-

853. Ramírez, but not Alvarado, was also charged with conspiracy to possess firearms during a drug trafficking crime (Count 6). See 18 U.S.C. § 924(o).

Both defendants pled guilty to all charges but contested the drug quantities attributable to them. Ramírez also contested the two-level sentencing enhancement for leadership role that the government sought. The district court held extensive hearings for each defendant in the conspiracy to determine the drug quantity individually attributable to each for sentencing purposes, following United States v. Correy, 570 F.3d 373, 380, 382-84 (1st Cir. 2009), and to determine whether any role enhancements were justified.

The evidentiary hearings for both defendants showed that the drug organization sold large quantities of its products. Proceedings in both cases focused on Pámpanos as the drug point for which the prosecution had the most available evidence. Pámpanos operated 24 hours per day, with sellers working two twelve-hour shifts. At least two sellers would work during each shift. The drugs at Pámpanos and elsewhere were sold in individual baggies; a "package" consisted of 25 baggies. During the course of the investigation at Pámpanos, agents seized a collection of 399 baggies of crack. From that seizure, the agents learned that each baggie contained approximately 0.2 grams of crack. Thus, each package of 25 baggies contained approximately 5 grams of crack.

-6-

The drug ring primarily sold crack, but it also sold lesser amounts of heroin, cocaine, and marijuana, in that order. At the sentencing hearings, Agent León testified that he could not always tell during his surveillance whether a baggie contained crack or cocaine, but he could distinguish heroin and marijuana by their different packaging and appearance. He further testified that, during an uninterrupted half-hour period of surveillance at Pámpanos, a seller had been observed making approximately 25 sales during a shift for which three sellers were active. He noted that the drug points would sometimes make more sales than that, with surveillance videos showing a single seller making seven or eight transactions in just a few minutes, while at other times they would be less busy, with "short periods" of a few minutes passing between transactions. Agent León explained that he corroborated the level of activity shown in this particular sample as relatively typical by comparing it to videos from other days and by confirming it with cooperators.

Agent León testified that he then extrapolated in order to arrive at an estimate of total drug quantity. He explained that this overall level of sales activity corresponded to about 50 sales per seller per hour, and that with three sellers active (as there were at the time this particular video was filmed) this would give approximately 150 sales per hour at Pámpanos. Within those 150 transactions, Agent León then estimated that approximately 40

involved crack, and that the remaining 110 transactions involved heroin, marijuana, or cocaine. From there, Agent León multiplied the hourly sales of crack by 24, then multiplied by 0.2 grams per sale, resulting in a total of approximately 200 grams of crack (40 packages, or 1000 baggies) sold per day at Pámpanos.

Agent León's estimate was slightly lower than the PSR's overall estimate of 250 grams of crack sold per day at Pámpanos, and was generally consistent with a cooperator's grand jury testimony that he had sold 14 packages during his last day at Pámpanos.[1]

The district court used Agent León's estimate to determine the quantities of crack foreseeable by each defendant. As to Ramírez, the government had asked the court to find that at least 4.5 kilograms were foreseeable, explaining that this amount is less than a single month's total sales of crack at Pámpanos alone and noting that Ramírez had been involved in the conspiracy for years, much more than the single month needed to prove 4.5 kilograms. The district court agreed that the government proved that quantity by a preponderance of the evidence. It explained:

> I provide full credit to the amount of drugs
> that was determined by [Agent León] who had
> surveillance, who performed surveillance in

---

[1] If the cooperator's co-seller sold a similar number, the two would have sold about 28 packages during their 12-hour shift. If the other shift was similar, the drug point would have sold about 56 packages in 24 hours. This is higher than, but still comparable to, the estimate that Agent León gave.

Sal[i]stral and at Pampanos and who saw plenty
of television t.v. videos of the drug
transactions at Pampanos and at the Salistral
ward, and who interviewed the cooperators, and
who had access, as I had access, to the grand
jury transcripts.

That quantity triggered a base offense level of 38 for Ramírez. The court then found that a two-level leadership enhancement was justified, noting that "I could have gone higher [than two levels] there. But the presentence report reflects only two levels. The United States has not objected. So I go with two." The court then applied another two-level increase for selling drugs in a protected location and a three-level decrease for acceptance of responsibility, leaving a total offense level of 39. This corresponded to a 262 to 327 month Guidelines range, from which the court departed downward by 100 months to impose a prison term of 162 months. The district court described Ramirez's crime of conviction as 21 U.S.C. § 841(a)(1) (the baseline drug distribution offense not premised on any specific quantity) and made no mention of any mandatory minimum that might imply a conviction for an aggravated version of the crime.[2]

---

[2] The written judgment does not cite or rely on 21 U.S.C. § 841(b)(1)(A). The dissent notes that it does recite a quantity of 50 grams of cocaine base. However, the judgment also recites quantities of one kilogram of heroin, five kilograms of cocaine, and 100 kilograms of marijuana. That is because those were the conspiracy-wide quantities charged in the indictment, and Ramírez pleaded guilty to that count -- not because the district court chose to insert its own quantity findings into the judgment.

As to Alvarado, the court calculated a lesser quantity. The court noted that the government's evidence showed that Alvarado had participated in the conspiracy for 85 days. It then rejected the government's suggestion that it find a quantity of 4.5 kilograms. The court credited the evidence showing an average of 40 drug transactions per hour at the Pámpanos drug point, below Agent León's estimate, and further estimated that crack was sold "at a conservative rate of 20 baggies per hour" because it was "the best-selling substance." That estimate was about half of the 40 baggies of crack per hour that Agent León had estimated were sold at Pámpanos. From there, the court, again favorably to Alvarado, assumed "the lowest average of cocaine base dose" that was supported by the evidence, 0.075 grams (below Agent León's estimate of 0.2 grams), which Alvarado had explicitly asked the court to adopt. The court then found that these numbers gave a total of at least 36 grams of crack sold daily, which yielded "a total of not less than 3.06 kilograms" of crack sold over the course of Alvarado's 85-day participation. The court concluded that, because Alvarado knew the drug point operated 24 hours per day, the entire quantity of 3.06 kilograms was foreseeable by Alvarado.

That finding corresponded to a base offense level of 36, which was triggered by a quantity of at least 2.8 kilograms of crack. After including an aggravating adjustment for selling drugs in a protected location and mitigating adjustments for minor

participation generally, minor participation in drug trafficking, and acceptance of responsibility, the court reached a total offense level of 31, corresponding to a Guidelines range of 120 to 135 months. The court described Alvarado's crime of conviction as § 841(a)(1) and made no mention of any mandatory sentencing range implying a conviction for an aggravated version of the crime. The court sentenced Alvarado to a term of 132 months, within the Guidelines range.[3]

## II.

We first reject the defendants' newfound <u>Alleyne</u> argument, then turn to the original issues on appeal.

In supplemental briefs filed after we heard oral argument, both defendants argued that their sentences violate the Sixth Amendment because they were imposed on the basis of factfinding by a judge on a preponderance of the evidence standard rather than by a jury on a beyond a reasonable doubt standard. <u>See</u> <u>Alleyne</u>, 133 S. Ct. at 2162-63. These arguments are meritless.

<u>Alleyne</u> instructs that a defendant's Sixth Amendment right to a trial by jury requires that "facts that increase

---

[3] Both defendants also received supervised release terms of ten years. Neither defendant had the prior convictions necessary to trigger an extended supervised release term. Thus, this supervised release term is well above any mandatory minimum that could have applied -- five years under § 841(b)(1)(A), four under § 841(b)(1)(B), and three under § 841(b)(1)(C) -- and gives no indication that the district court sentenced the defendants under § 841(b)(1)(A) rather than § 841(b)(1)(C).

mandatory minimum sentences must be submitted to the jury." Id. at 2163 (emphasis added). Alleyne is equally clear what the Sixth Amendment does not require, explaining: "Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." Id. In other words, factual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in Alleyne. The holdings of the seven circuit courts to have addressed this issue agree with our view. See, e.g., United States v. Rodriquez, No. 13-30742, 2014 WL 968841, at *1 (5th Cir. Mar. 13, 2014) (per curiam) (holding that sentencing judge may find facts that do not change mandatory minimum or maximum statutory ranges); United States v. Robinson, No. 13-4384, 2014 WL 406782, at *2 (3d Cir. Feb. 4, 2014) (per curiam) (holding that district court "retained the ability to make factual findings necessary to calculate [defendant's] advisory Sentencing Guidelines range" without submitting those questions to a jury); United States v. Valdez, 739 F.3d 1052, 1054 (7th Cir. 2014) (holding that, where "[t]here is no indication . . . that the district judge thought her sentencing discretion was cabined by a higher statutory minimum" than that supported by the drug quantities charged or admitted by

defendant, district court's calculation of "a greater drug quantity solely for purposes of determining [defendant's] Guideline range" did not violate Alleyne rule); United States v. Holder, 549 F. App'x 214, 215 (4th Cir. 2014) (per curiam) ("[A]lthough judicially determined facts are no longer relevant after Alleyne to deciding the applicable mandatory minimum, the factual findings needed to calculate a defendant's advisory Guidelines range are still within the district court's province."); United States v. Baum, 542 F. App'x 724, 727 (10th Cir. 2013) (holding that district court's factfinding for Guidelines purposes, without altering mandatory minimum, was permissible under Alleyne); United States v. Johnson, 732 F.3d 577, 583-84 (6th Cir. 2013) (holding that judicial factfinding of crack cocaine quantity does not violate Alleyne rule where it does not alter mandatory minimum sentence); United States v. Ibrahim, 529 F. App'x 59, 64 (2d Cir. 2013) ("Because the Sentencing Guidelines are advisory rather than mandatory, application of guidelines enhancements that do not increase the statutory maximum or minimum penalty neither implicates nor violates a defendant's Sixth Amendment right to a jury trial." (citation omitted)).

We flatly reject the proposition that all drug quantity calculations made under the advisory Guidelines must be submitted to a jury. That would be both contrary to Alleyne and an extension of Alleyne. We are not empowered to do so under United States v.

-13-

<u>Booker</u>, 543 U.S. 220, 245 (2005).  <u>Accord</u> <u>Valdez</u>, 739 F.3d at 1054.

We also flatly reject the argument that, absent the imposition of

a mandatory minimum sentence, there is <u>Alleyne</u> error here.  It is

evident from the statutory scheme that drug quantity is not an

element of every drug distribution crime, including under <u>Alleyne</u>.

<u>See</u> <u>Alleyne</u>, 133 S. Ct. at 2162 (holding that, for Sixth Amendment

purposes, a fact is an element of the offense only when it alters

the available sentencing range).  The "default" drug distribution

crime, with a sentencing range of 0 to 20 years, can be proven

without any allegation of quantity at all.   <u>See</u> 21 U.S.C.

§ 841(b)(1)(C).  This stands in sharp contrast to the aggravated

drug distribution crimes, in which some triggering quantity of

drugs must be proven.  <u>See</u> <u>id.</u> § 841(b)(1)(A), (b)(1)(B).[4]

Our decisions in prior cases hold that failing to prove

an individualized drug quantity is an <u>Alleyne</u> error only in cases

in which the defendant has been convicted and sentenced under the

---

[4]    Prior First Circuit cases have held that, in a drug conspiracy case, the defendant's eligibility for a statutory mandatory minimum sentence is controlled by an individualized drug quantity attribution, <u>see</u> <u>United States</u> v. <u>Colin-Solis</u>, 354 F.3d 101, 103 (1st Cir. 2004), whereas his statutory maximum sentence is controlled by a conspiracy-wide drug quantity attribution, <u>see</u> <u>United States</u> v. <u>Correy</u>, 570 F.3d 373, 377 (1st Cir. 2009).  It is unclear whether this asymmetry may remain after <u>Alleyne</u>.  The parties here do not raise the issue, and we do not consider it.  We do note, however, that to the extent the dissent argues that the availability of a life sentence as the statutory maximum shows that the defendants were sentenced under the aggravated provisions of § 841(b)(1)(A) rather than the default provisions of § 841(b)(1)(C), that pre-<u>Alleyne</u> asymmetry defeats the conclusion.

-14-

aggravated version of the statute -- that is, where an enhanced mandatory minimum applies.  See, e.g., United States v. Delgado-Marrero, 744 F.3d 167, 185-86 (1st Cir. 2014); United States v. Pena, 742 F.3d 508, 509 (1st Cir. 2014); United States v. Harakaly, 734 F.3d 88, 90, 92-93 (1st Cir. 2013).  Likewise, we have held that no Alleyne error occurs where, as here, the defendant is convicted of, and sentenced pursuant to the penalty provisions of, the default crime.  See United States v. Doe, 741 F.3d 217, 234 (1st Cir. 2013).  No Alleyne error occurs when a defendant's sentence is based entirely on Guidelines considerations without changing the applicable mandatory minimum.

With these principles in mind, we turn to the facts of this case as to each defendant.  If Ramírez had been convicted of an aggravated version of the crime, the mandatory minimums to which he could have been exposed were 10 years for 50 grams or more of cocaine base or 5 years for 5 grams or more; if Alvarado had been convicted of an aggravated version, the mandatory minimums to which he could have been exposed were 10 years for 280 grams or more of cocaine base or 5 years for 28 grams or more.  See 21 U.S.C. § 841(b)(1), amended by Pub. L. No. 111-220, 124 Stat. 2372 (2010).[5]  As noted, Ramírez was sentenced to 162 months, while

_____

[5]  The mandatory minimums of 10 years and 5 years are now triggered by quantities of 280 grams and 28 grams of cocaine base, respectively, due to amendments in the Fair Sentencing Act of 2010 (FSA), Pub. L. No. 111-220, 124 Stat. 2372, 2372 (2010).  Whether a defendant is subject to pre- or post-FSA penalties depends on the

Alvarado was sentenced to 132 months, and both sentences were explicitly based on Guidelines considerations.

A.      Ramírez

As stated, no Alleyne error occurs when there is no mandatory minimum sentence imposed which is triggered by judicial factfinding.  Ramírez's case fits this model.  The record provides no evidence that the district court made any findings to trigger a 10-year mandatory minimum; rather, it shows that the court imposed a Guidelines sentence.[6]  That distinguishes Ramírez's case from

_____

date of sentencing: defendants sentenced before the FSA's effective date of August 3, 2010 are subject to pre-FSA penalties, while those sentenced afterward are subject to post-FSA penalties.  See Dorsey v. United States, 132 S. Ct. 2321, 2326 (2012).  Ramírez was sentenced in March 2010 and so is subject to the pre-FSA penalties; Alvarado was sentenced in March 2011 and so is subject to the post-FSA penalties.

[6]  After calculating the Guidelines range, the court departed downward from it, reasoning:

> Based on a total offense level of 39 and a criminal history category of I, the guideline imprisonment range in this particular offense is from 262 to 327 [months] . . . .
> The Court notes Mr. Ramirez has no diagnosis of any mental disorder or [any] major physical depression.  However the Court is aware he has had a history of marijuana use and Percocet pills. . . . The Court further notes that even though the defendant has one criminal [history] point the instant offense is his first conviction of a felony offense. . . .
> The Court recognizes the following mitigating [§] 3553 factors: First, he was the first defendant amongst the leaders who plead [sic]. . . . The Court further recognizes the defendant's stressful, tough, difficult childhood . . . .
> Taking into consideration the above-mentioned factors and in order also to avoid sentencing disparities, a variance in sentence will be imposed that

-16-

Alleyne, in which judicial factfinding "alter[ed] the legally prescribed punishment so as to aggravate it." 133 S. Ct. at 2162. Indeed, neither the judge nor either party at sentencing even mentioned that a mandatory minimum was under consideration, and there is no indication that the sentencing judge considered Ramírez to have been convicted of anything other than the default crime. Instead, the sentence was based only on Guidelines considerations. Given that clear basis for the sentence, we cannot say that any judicial factfinding altered Ramírez's legally prescribed sentencing range. Ramírez has provided no evidence to the contrary, and we see none in the record.[7]

Ramírez argues that Alleyne still governs because his sentence, even if imposed under the Guidelines, exceeds the 10-year mandatory minimum. We disagree. The fact that Ramírez's sentence falls above the 10-year mandatory minimum is insufficient to establish that the mandatory minimum governed or that an Alleyne

---

is sufficient but not greater than necessary.
    Therefore, it is the judgment of this Court that this defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 162 months as to counts one through five. This represents a variance from the guidelines of over one hundred months. The mandatory minimum played no part in this assessment.

[7] Ramírez argues that a reference to the mandatory minimum at his change-of-plea hearing shows that his sentence was based on the mandatory minimum. Apart from the fact that this hearing occurred more than ten months before his sentencing proceeding, there is no evidence in the record that the district court considered that earlier remark while imposing sentence.

-17-

error occurred. In <u>Alleyne</u>, the Court explained that the fact that a sentence was available even without improper judicial factfinding does not negate a Sixth Amendment error because the improper factfinding would change the elements of the crime. See <u>Alleyne</u>, 133 S. Ct. at 2162. We think it follows that the fact that a sentence is above a potential mandatory minimum does not create a Sixth Amendment error where there has been no change in the elements of the crime. <u>Cf.</u> <u>United States</u> v. <u>Caba</u>, 241 F.3d 98, 101 (1st Cir. 2001) (holding that no <u>Apprendi</u> error occurred where district court sentenced defendant based on Guidelines range, even though quantity of crack cocaine that district court found for Guidelines purposes was high enough to allow higher statutory maximum). There is no <u>Alleyne</u> error in Ramírez's case.

B.      <u>Alvarado</u>

Alvarado likewise was not sentenced based on a mandatory minimum, but rather was sentenced under the Guidelines. While pronouncing sentence with respect to Alvarado, the district court explained:

> Based on a total offense level of 31, and a criminal history category of I, the guideline imprisonment range is from 120 to 135 months with a fine range of 15,000 to 20,000, plus a supervised release term of 10 years. . . .
> Now, the Court does not provide any downward departure as a mitigating circumstance related to diminished mental capacity because of the report which the Court received on August 26th, 2010 from the

> forensic evaluation performed by Dr. Manuel A.
> Guttierrez. . . .
>      Therefore, the sentence for this
> defendant is to be imprisoned for a term of
> 132 months as to counts one, two, three, four,
> and five to be served concurrently with each
> other.

This sentence, like Ramírez's, was based on Guidelines considerations. It did not depend in any way on a mandatory minimum, nor is there any indication in the record that the sentencing judge considered Alvarado to have been convicted of an aggravated version of the crime to which a mandatory minimum would have attached. Thus, as with Ramírez's sentence, no <u>Alleyne</u> error occurred with respect to Alvarado's sentence.[8]

III.

We now turn to the defendants' challenges to the adequacy of the evidentiary base for the district court's findings of fact in support of its Guidelines sentences.

A.      <u>Ramírez</u>

1.      <u>Use of Hearsay Evidence</u>

Ramírez's principal argument is that the district court based its Guidelines factfinding, and thus its sentence, on

---

[8] Given the facts outlined in this opinion, no reasonable jury could have found that the defendants were responsible for drug quantities below the respective thresholds triggering the mandatory minimum sentences. As a result, even if an <u>Alleyne</u> error occurred, it was harmless beyond a reasonable doubt. <u>See</u> <u>Harakaly</u>, 734 F.3d at 95-96.

unreliable hearsay evidence, in violation of his due process rights.

Reliable hearsay is, of course, admissible during sentencing proceedings. See, e.g., United States v. Cash, 266 F.3d 42, 44 (1st Cir. 2001). Ramírez cites cases from other circuits finding due process violations when the district court "reli[ed] on accomplice hearsay without adequate indicia of reliability," United States v. Corral, 172 F.3d 714, 716 (9th Cir. 1999), or when allegations that were "false or unreliable . . . made the basis for the sentence," United States v. McGowan, 668 F.3d 601, 606 (9th Cir. 2012). See also United States v. Robinson, 164 F.3d 1068, 1070 (7th Cir. 1999); United States v. Huckins, 53 F.3d 276, 280 (9th Cir. 1995). He also cites to United States v. Tavano, 12 F.3d 301, 305-07 (1st Cir. 1993), in which this court vacated a sentence on due process grounds where the district court had refused to consider evidence of drug quantity favorable to the defendant that had not been introduced at trial. From these cases, Ramírez argues that sentences based entirely on unreliable hearsay evidence violate due process.

Even assuming, without deciding, that Ramírez's formulation of the rule is correct, this argument fails. There is no indication that the hearsay testimony used was unreliable. Indeed, the district court squarely confronted the question of the reliability of the hearsay testimony with respect to foreseeable

-20-

drug quantity.  The court found that the hearsay testimony was corroborated by Agent León's own surveillance and his review of the surveillance videos other officers had taken.  With respect to the hearsay evidence pertaining to Ramírez's leadership role, the district court likewise addressed the reliability question directly, noting that "the information is quite reliable" because it was supported by Agent León's personal knowledge and observation of the videos, as well as the court's own independent review of those videos.

Because the district court carefully ensured that the evidence it relied upon was corroborated, Ramírez's sentence was not driven by the admission of unreliable hearsay.  Thus, the due process rule that he cites is not implicated.  Ramírez does not argue that a due process violation may occur even when the hearsay is reliable, as the district court permissibly found here.

2.    Sufficiency of Evidence of Leadership

Ramírez further argues that the evidence of his leadership role in the conspiracy was insufficient to justify the district court's finding that he was a leader, which triggered a two-level Guidelines enhancement.  This argument, however, is waived because Ramírez explicitly abandoned it during the sentencing hearing.  At the final hearing, the following exchange took place:

> THE COURT:  . . . You realize that I read a transcript that [Ramírez] is also a leader.

-21-

> Your leader undoubtedly.  I don't think you
> are challenging the two point that is are
> [sic] being provided, right.
> MR. RIVERA: No. No. Those two points no.  It
> is gist [sic] if I could argue for just a
> little bit.[9]

When asked directly, in other words, counsel for Ramírez explicitly abandoned any challenge to the leadership enhancement.  This waived any argument that the evidence did not show Ramírez's leadership role.  See United States v. Rodriquez, 311 F.3d 435, 437 (1st Cir. 2002).

Even if Ramírez had not waived this argument, we would still find the two-level enhancement justified.  The Guidelines provide that, when contemplating a leadership enhancement, courts should consider factors such as:

> the exercise of decision making authority, the
> nature of participation in the commission of
> the offense, the recruitment of accomplices,
> the claimed right to a larger share of the
> fruits of the crime, the degree of
> participation in planning or organizing the
> offense, the nature and scope of the illegal
> activity, and the degree of control and
> authority exercised over others.

U.S.S.G. § 3B1.1, cmt. (n.4) (2012).  Here, the district court heard evidence that Ramírez had been entitled to "all the profits for heroin" sold at the Kennedy drug point, and that he was an owner of the Salistral drug point.  Together with his role as a

---

[9]  Ramírez's counsel went on to reiterate the argument that the drug quantity calculation was not supported by reliable evidence, then turned to mitigating factors.

-22-

wholesale supplier across several different drug points, this evidence shows, at a minimum, that Ramírez had claimed a right to a larger share of the criminal profits, performed a greater degree of planning or organizing the offenses, engaged in a wide scope of the illegal activity, and exercised a substantial degree of control and authority over others. That is sufficient to justify the leadership enhancement.

B.      Alvarado

Alvarado argues that the district court's findings on drug quantity in his case were not supported by the evidence presented at the sentencing hearings.

We review the district court's factual decisions regarding drug quantity for clear error. See United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005). Drug quantity findings may "be based on approximations" as long as those approximations "represent reasoned estimates of drug quantity." United States v. Ventura, 353 F.3d 84, 88 (1st Cir. 2003). A defendant may be held responsible only for drug quantities "foreseeable to [that] individual." United States v. Correy, 570 F.3d 373, 380 (1st Cir. 2009). Foreseeability encompasses "not only . . . the drugs [the defendant] actually handled but also . . . the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004).

The district court found that a quantity of 3.06 kilograms of crack cocaine was reasonably foreseeable to Alvarado.[10] This finding was not clearly erroneous. It was based on the most lenient assumptions toward Alvarado that the record allowed: quantities of just 0.075 grams per baggie, based on Alvarado's request that the court use that more favorable estimate; just 20 baggies of cocaine base per hour, based on a conservative estimate from Agent León's testimony about the amount of activity at Pámpanos and amply supported by video footage; 24-hour operation of Pámpanos, based on Agent León's testimony and grand jury testimony from cooperators; and 85 days' worth of participation in the conspiracy, based on the favorable assumption that Alvarado did not participate before the date of the first recording on which he appeared or after the date of the last recording. Each of these conclusions was a "reasoned estimate," Ventura, 353 F.3d at 88, directly grounded in the evidence, and none was clearly erroneous. Nor was there clear error in the total finding of 3.06 kilograms of cocaine base resulting from those factors.

Alvarado points to these assumptions in his favor as evidence that the findings were unreliable. He argues that the district court's unwillingness to adopt the government's evidence

_____

[10] The offense level in the Guidelines would have been triggered by a finding as low as 2.8 kilograms. We need not consider the differences between the two quantities, however, because the district court's finding of the larger quantity was sufficiently supported by the record.

wholesale reveals that the court found that evidence unconvincing, but that "if there was no sufficient basis to conclude legally, and reliably that 40 [crack] transactions occurred every hour [as Agent León testified], then there is no sufficient basis to conclude either that 20 transactions per hour took place."  That argument fails.  Determining drug quantity is "likely to require . . . the exercise of sound judgment" on the part of the district court, and a district court's decision to make "reasonable" estimates in favor of the defendant is not itself grounds for concluding that the evidence is unreliable.  United States v. Bernier, 660 F.3d 543, 548 (1st Cir. 2011); see also id. at 548-49 (approving, "without serious question," the district court's "measured approach, [which] evaluated the testimony carefully, and erred, if at all, on the side of caution" by "us[ing] conservative figures and low-end estimates").  That principle controls here: the district court's use of conservative estimates was part of a measured and scrupulous approach to calculating the quantity foreseeable to Alvarado.  It does not show that the calculation lacked justification entirely.

IV.

   We affirm.


- Dissenting Opinion Follows -

**TORRUELLA, <u>Circuit Judge</u>, dissenting.** As this case stands, both defendants pleaded guilty to all but the alleged drug quantity, and no jury played a part in the district court's finding regarding this essential element of the charged offenses. Their sentences cannot rest on an element that was neither pled to nor found by a jury beyond a reasonable doubt. Accordingly, the defendants' sentences are required to be vacated, and the case remanded for resentencing. <u>See</u> <u>United States</u> v. <u>Alleyne</u>, 133 S. Ct. 2151 (2013).

In this appeal, defendants originally challenged their sentences on evidentiary grounds. After oral arguments, but while our decision here was still pending, the Supreme Court decided in <u>Alleyne</u> that any fact that increases the mandatory minimum sentence that a defendant stands to receive is an element of the offense that must be found by a jury beyond a reasonable doubt. <u>Id.</u> at 2156. Understandably, because <u>Alleyne</u> had not been decided, the district court did not inform defendants Ramírez and Alvarado of this right. Instead, the district court made determinations of drug quantity by a preponderance of the evidence, without submitting this question to a jury, and sentenced defendants under a mandatory minimum, in violation of <u>Alleyne</u>. This was clear error on the part of the court. My brethren disagree.

Although the district court acted within the bounds of the law as it stood at the time of sentencing, the law has changed,

and the district court's reliance on what was, at the time, an accepted practice, cannot save the sentence from running afoul of the Sixth Amendment.  My colleagues rely on assumptions, which I will dispel, to reach a result that I find flies in the face of what is now a clearly established constitutional right.

## I.  Background

I take no issue with the majority's recitation of the facts and only add, and perhaps reiterate, what I find is relevant to respectfully espouse my view that they are mistaken.

## A.  Procedural History

In May 2008, a grand jury returned a seven-count indictment against Alvarado, Ramírez, and 109 other co-defendants for, inter alia, conspiracy to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1). The defendants, who had initially pled not guilty, changed their pleas to guilty, refusing however, to concede that they were responsible for any specific drug amount. Drug quantity, and thus, the statutory range of punishment they would be exposed to, would be determined during sentencing.

In order to uphold its opinion, the majority is of the view that mandatory minimums were never at play during sentencing proceedings for either defendant.  The district court made no mention of the phrase, they contend, hence it must be that the court considered only the Guidelines at sentencing, and proceeded

to sentence both defendants, according to the Guidelines, and within the zero-to-twenty year statutory range of the subsection of § 841 that does not require a finding of drug quantity.

The record shows otherwise, and contravenes my brethren's assumptions and no-harm-done conclusion. Perusal of the transcripts of the change of plea and sentencing hearings, the sentences imposed, and other parts of the record provide more than enough detail to trump any doubt that mandatory minimums were definitive, and integral to the sentencing proceedings. As I will elaborate in more detail, the exchanges between the court and counsel are particularly relevant to defeating the majority's view. They clearly establish that the district court was at all times considering a statutory range of ten years to life, which, under § 841 (b)(1)(A) required a drug quantity determination of 280 grams in the case of cocaine base.

To the extent the drug quantities attributable to each defendant -- and the mandatory minimums that go with them -- were determined by the district court, rather than a jury, and were found by a preponderance of the evidence, the Alleyne error is inescapable.

## B. Change of Plea Hearing

During the change of plea hearing held for defendants on May 8, 2009, both indicated that they intended to contest the drug quantity amounts attributed to them, as well as their roles in the

-28-

conspiracy, during the sentencing proceedings.  To be sure, both defendants refused to admit any drug quantity.  A lengthy exchange between the court and counsel ensued regarding, inter alia, the applicable statutory minimum as to each defendant.

Discussions of the mandatory minimum in the change of plea hearing began when the government declared that the maximum sentence the defendants were exposed to was a "term of life imprisonment, [and] at least ten years of supervised release," and specifically as to the conspiracy charge, "up to life imprisonment . . . . and a minimum of ten years."  Tr. for Chg. of Plea Hr'g. at 46-47.  Later on, the judge remarked that "[t]he statutory is clear. It's ten to life as to all."  Id. at 53, 54.

But that was not the end of it.  A discussion then followed regarding the ability of each defendant to enter a straight guilty plea to an indictment where each substantive count carries a ten-year mandatory minimum, while not conceding drug quantity.  The district court expressed concern that, with such a guilty plea, it could not sentence defendants to less than the ten-year minimum, regardless of what could later be proven at sentencing.  Id. at 58-59.  Counsel for Alvarado maintained, however, that each defendant was entitled to an individualized drug amount determination, and that if the minimum quantity threshold was not proven, the ten year mandatory minimum could not be imposed.  Id. at 60.

The district court then briefly revisited our decision in United States v. Colón-Solís, 354 F.3d 101 (1st Cir. 2004). In Colón-Solís we held that to apply a mandatory minimum sentence for a drug conspiracy coconspirator, the court must make an individualized finding, by a preponderance of the evidence, ascribing the triggering drug quantity to that coconspirator. Id. at 103. Enlightened by that principle, the district court then remarked that "[i]n order to determine the applicable minimum, the court, notwithstanding any other statement made, as to each and every one of the counts, reserves the specific individual sentencing amount . . . . which may be below the statutory minimum of ten years." Tr. for Chg. of Plea Hr'g. at 70-71. The question of the applicable statutory minimum was in the mind of all players, and was left open for determination at the sentencing proceedings.

The U.S. Probation Office representative then proceeded to compose the PSR. It underwent several changes and amendments as a result of court orders and objections from defendants, mostly regarding drug quantity attributions. A final PSR was submitted to the district court in January 2010, and it reflected a 56 grams-per-day amount sold at Pámpanos, and an offense level of 33. Once again, both Ramírez and Alvarado objected to the drug quantity assessment in the sentencing memoranda they filed prior to their sentencing hearings.

## C.   Sentencing

### 1.   Alvarado's Sentencing Hearings

Sentencing proceedings for Alvarado began on February 1, 2010, with an offer from the government to stipulate the drug quantity for a mandatory minimum sentence of 120 months; the ten year minimum under § 841(b)(1)(A).  The court acknowledged the government's offer and, upon Alvarado's refusal to stipulate any drug quantity, warned that by not accepting the stipulation, he was exposed to a penalty that, according to the drug quantity found by the court, may or may not reach the threshold for the mandatory minimum.  The court then stated that "[t]he burden of proof is on the United States by a preponderance of the evidence, not beyond a reasonable doubt standard because the amount is not an element of the crime", and explained once again that if he were to accept the government's offer, he would receive the mandatory minimum sentence for 50 grams of crack of ten years.  Tr. for Sent. Hr'g. for Def. Alvarado, Feb. 1, 2010 at 7.  Thereafter, there were several other references to what amount of crack would trigger which statutory minimum.  Alvarado remained steadfast in his opposition to accepting any drug quantity, and the government proceeded to attempt to make its case.

Agent León was the main witness for the prosecution at sentencing.  His testimony was based on personal surveillance,

video recordings, his presence at a drug seizure, and information relayed to him by cooperating witnesses.

Agent León testified that he conducted surveillance 10 to 15 times during daytime and approximately 15 times during nighttime for 30- to 60-minute periods, and from a distance of 50 to 200 feet. He estimated that around 200 grams of crack were sold each day, totaling six kilograms per month, based on his calculations that each small baggy contained 0.2 grams of crack multiplied by 25 (the number of small baggies in a single package) and then by 40 (the number of packages sold per day). He stated that he made these estimates on the basis of averages extrapolated from 30-minute periods of video and from personal surveillance. In addition, he stated that he reached that figure through interviews he carried out with sellers who had become cooperators. These cooperators were not presented as witnesses at sentencing. He also interviewed the individual that made the video recordings who personally saw transactions that were not in the videos. Finally, he extrapolated from his presence at a drug seizure where 400 bags of crack or cocaine were seized, and made a calculation as to how much was sold at the drug point per day.[11] Agent León nevertheless conceded that drug sales were not the same every day.

_____

[11] On the third day of the sentencing hearing, Agent León testified that "400 bags of coke" were seized, but on cross-examination, stated that it was "400 bags of crack" that were seized.

-32-

During the course of the investigation, 78 video recordings were made by a cooperating witness who was also not presented as a witness. A selection of the video recordings were shown in edited form, jumping from one day to the next, skipping days, and moving between different times of the day. The recordings depicted sales of substances identified by Agent León as "either cocaine or crack"; he could not identify which precisely. Video recordings were not made when no drug transactions were occurring.

Agent León's testimony regarding Alvarado specifically was based on his personal surveillance and interviews with cooperating witnesses, who were not presented as witnesses at sentencing. He stated that he personally witnessed Alvarado at the drug point during the night in March and in April 2008. Coincidentally, no video recordings were made on those nights. However, Agent León positively identified Alvarado in video recordings on fifteen different days.

On March 14, 2011, the final day of sentencing proceedings began with a discussion of how the Fair Sentencing Act's new triggering drug quantities affected the mandatory minimum sentence for Alvarado. Defense counsel stated there was perhaps evidence to sustain 28 grams of crack, enough for a mandatory minimum of five years, but certainly not enough for the 280 grams that would trigger the ten year mandatory minimum. The government

retorted that it had proven Alvarado was responsible for 4.5 kilograms of crack, more than enough for the ten year minimum.

Throughout the evidentiary hearings, counsel for Alvarado pointed to the want of reliability of the evidence presented by the government. Specifically, counsel insisted that a considerable part of Agent León's testimony relied on hearsay and double hearsay, that his drug quantity calculations were often inconsistent and his averages were exaggerated to the point of being implausible, and that the videos were taken at different intervals, with none being taken when transactions were not occurring.

Nonetheless, the district court found that 3.06 kilograms of crack were attributable to Alvarado for his role in the conspiracy. The court discussed the guidelines, and arrived at a sentencing range of 120-135 months. The court then imposed a sentence within that range of 132 months for each count, to be served concurrently, and a term of supervised release of ten years. The minimum range determined by the court is the statutory minimum for § 841(b)(1)(A). That section also mandates a term of supervised release of no less than five years for those with a criminal record, and ten years for those with certain kinds of prior convictions.

## 2.  **Ramírez's Sentencing Hearings**

At Ramírez's sentencing, Agent León testified that he participated in the investigation of the Pámpanos drug point by performing surveillance, reviewing surveillance videos, interviewing cooperating witnesses, confiscating drugs, and providing support to colleagues who conducted surveillance at Salistral.  Specifically, he conducted an investigation from November 2007 until June 13, 2008, surveilled Pámpanos personally 25 to 30 times, and viewed 78 video recordings taken by a witness at Pámpanos.  He also seized 399 baggies of cocaine in an apartment which a contracted chemist and lab supervisor, José Mercado, estimated to contain 0.2 grams per baggy.  However, no official laboratory results were entered into evidence during the sentencing hearings.  Also, during his surveillance, Agent León never spotted Ramírez, nor did he appear in any of the Pámpanos videos.

Ernesto Vidro, a cooperating witness, identified Ramírez's role in the conspiracy during grand jury proceedings.  At sentencing, Agent León relayed this information, but Vidro was not presented as a witness.

As to Pámpanos in particular, Agent León calculated averages for transactions and drug quantities relying on essentially the same information and dubious methodology as for Alvarado.

Finally, Agent León testified that Ramírez's role as supplier of cocaine to the Kennedy drug point to be cooked to crack, was relayed to him by another cooperating witness, Ramón González. González, who also offered grand jury testimony, was also not presented as a witness at sentencing.

During the sentencing hearing, the district court expressed concern about the evidence being presented:

> This is a bench hearing and you don't know because I may very well state that the hearsay is of such magnitude in this case that it borders and it tramples due process, because up to now is pure hearsay as to liability and ownership -- let me tell you all of the hearsay I've heard, because I've put them down here.
>
> As to ownership, purely hearsay. As to supplier, purely hearsay. As to quantity, purely hearsay, up to now.

Tr. of Sent. Hr'g. for Def. Ramírez, Feb. 17, 2010 at 43. The district court reiterated this concern as the hearings continued and requested that the government file a legal memorandum "as to a sentence based purely on hearsay."

As to Ramírez's sentence, the ten year mandatory minimum was again a matter of discussion between the court and counsel. Defense counsel alluded to the ten year supervised release term Ramírez stood to receive and referenced an earlier statement by the court that "a ten or twelve year sentence is not a Mickey Mouse sentence," to which the court responded "[b]ut that doesn't mean he's going to get a ten year sentence", clearly alluding to the

mandatory minimum.  Tr. of Sent. Hr'g. for Def. Ramírez, Mar. 19, 2010 at 32.

Thereafter, the court reviewed the Government's supplemental brief and the evidence admitted at the evidentiary hearings, and found Ramírez responsible for 4.5 kilograms of cocaine, resulting in a base offense level of 38.  Notwithstanding the court's earlier apprehension and defense counsel's repeated objections, the court clarified that the drug quantity amount was determined giving:

> full credit to the amount of drugs that was determined by the policeman who had surveillance, who performed surveillance in Sal[i]stral and at Pámpanos and who saw plenty of . . . videos of the drug transactions at Pámpanos and at the Salistral ward, and who interviewed the cooperators, and who had access, as I had access, to the grand jury transcripts.

Id. at 44-45.

The court discussed the relevant guideline factors for a sentencing guideline range of 262-327 months.  Id. at 46.  The court then imposed a sentence within that range of 162 months, for five counts charged.  Upon release, Ramírez would be placed on supervised release for ten years as to three of the counts, to run concurrently.

Immediately thereafter, the court addressed Ramírez: "The court has sentenced you way below the statutory maximum.  So the sentence is not illegal.  I could have sentenced you to life."  Tr.

of Sent. Hr'g. for Def. Ramírez, Mar. 19, 2010 at 52.  Only § 841 (b)(1)(A) carries the possibility of a life sentence, and required, at pre-FSA quantities which were applicable to Ramírez, a drug quantity finding of at least 50 grams of cocaine base.

If there is any doubt that the district court's imposition of sentence was guided by its reliance on the threshold drug amount that triggers the mandatory minimum of ten years, the record provides the proverbial nail in the coffin.  The judgment for Ramírez describes his offense as a conspiracy with intent to distribute in excess of 50 grams of cocaine base, the triggering amount for ten to life prescribed by § 841(b)(1)(A).

## II.  Discussion

On appeal, defendants challenged the district court's findings at sentencing as to drug quantity.  They essentially argue that the court relied on hearsay, double hearsay, inconsistent testimony and faulty calculations of average drug amounts based on speculation, and unsupported by scientific data.  After oral argument, we ordered the parties to submit additional briefs on the issue of whether the Supreme Court's recent decision in Alleyne v. United States, 133 S. Ct. 2151 (2013), impacts this appeal.  In response to our supplemental briefing order, Ramírez and Alvarado argue that Alleyne prohibits their sentences, because the district court made individualized drug quantity determinations by a

preponderance of the evidence, without a jury's determination or their admission.

As I believe I have established, the record leaves no doubt that the district court was at all times weighing the evidence while targeting the mandatory minimum. And it did so by a preponderance of the evidence standard. That it also considered and determined the guideline range does not negate this fact. Accordingly, Alleyne squarely applies, and defendants hold the upper hand.

The relevant statute of conviction prohibits the "manufactur[ing], distribut[ing], or dispens[ing], or posess[ing] with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). At the time of Ramírez's sentencing, § 841 imposed a mandatory minimum sentence of twenty years to life for drug offenses involving more than fifty grams of crack cocaine.[12] 21 U.S.C. § 841(b)(1)(A)(iii), (viii) (2006), amended by Pub. L. No. 111-220, 124 Stat. 2372, 2372 (2010) (increasing this amount to 280 grams or more). If the defendant was responsible for five or more grams of crack cocaine, the law

---

[12] The triggering drug amounts were modified via the Fair Sentencing Act. Though the parties do not dispute, and assume in their briefs, that the old crack cocaine quantities and punishments apply, my brethren point out that Ramírez was sentenced in March 2010, before passage of the FSA, and is thus subject to penalties as they stood before the FSA. Alvarado, on the other hand, would perhaps reap the benefits of the FSA's more lenient crack cocaine amount provisions.

imposed a mandatory minimum sentence of five to forty years. 21 U.S.C. § 841(b)(1)(B)(iii), (viii) (2006), amended by Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, 2372 (2010) (increasing this amount to 28 grams or more). Lastly, a defendant could be sentenced to between zero and twenty years for violating section 841 with any unspecified amount of crack cocaine. 21 U.S.C. § 841(b)(1)(C).[13] These factual differences, the defendants argue, mean that the district court could not impose any sentence despite their guilty plea, because it only made individual drug quantity determinations by a preponderance of the evidence. They therefore urge us to vacate their sentences and remand.

In Alleyne, the Supreme Court held that "facts that increase the mandatory minimum sentence" to which a criminal statute exposes a defendant, are "elements [that] must be submitted to the jury and found beyond a reasonable doubt." 133 S. Ct. at 2158. This holding was merely an extension of the Supreme Court's prior decision in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (holding that, besides a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

---

[13] The FSA did not amend the relevant portion of this provision.

We have already had occasion to grapple with <u>Alleyne</u> and its implications. Recently, in <u>United States</u> v. <u>Harakaly</u>, 734 F.3d 88, 94 (2013) we recognized an <u>Alleyne</u> error in the context of a guilty plea involving a drug offense under § 841. Although Harakaly entered a straight plea of guilty, he had not admitted any particular amount of drugs involved in the crime charged. <u>Id.</u> at 91 ("When asked whether Harakaly conceded any drug quantity, defense counsel stated that he did not."). Harakaly's indictment was silent on drug quantity. <u>Id.</u> Nonetheless, during sentencing, the district court found Harakaly responsible for more than fifty grams of methamphetamine, triggering a ten-year mandatory minimum under § 841. Because we concluded that the district court violated <u>Alleyne</u>, we found error, but held that it was harmless beyond a reasonable doubt given the overwhelming evidence of drug quantity against Harakaly. <u>Id.</u> at 97.

Like the <u>Harakaly</u> court, the district court here erred when it made individualized drug determinations for Alvarado and Ramírez by a preponderance of the evidence, and set a statutory minimum based on that determination. If the defendant waives his right to a jury trial -- i.e., the right to, <u>inter alia</u>, have the element of drug quantity proven beyond a reasonable doubt -- then, in order to sustain a conviction, <u>Alleyne</u> logically requires the defendant's admission of drug quantity. At the time they submitted their guilty pleas, and all throughout sentencing proceedings,

-41-

defendants here specifically declined to admit to any drug quantity. Therefore, to allow the judgment to stand as is, is to sanction two convictions where an element of the offense has not been pled to, or found by a jury beyond a reasonable doubt; quite a flight in the teeth of Alleyne.

As defendants' case was pending on appeal at the time the Supreme Court handed down Alleyne, there is no question its holding applies here. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987)("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final. . . ."). Unlike Harakaly however, defendants here did not preserve their Alleyne claims below, and only argued the error on appeal after we ordered supplemental briefing on the issue. Accordingly, review of Ramírez and Alvarado's Alleyne claim, is for plain error. Cf. Harakaly, 734 F.3d at 94 ("This court reviews unpreserved Apprendi errors for plain error and preserved Apprendi errors for harmless error."); see also United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014). Plain error review requires a defendant to show that an error occurred; that the error was clear or obvious; and, that the error affected substantial rights, or the outcome of the case. United States v. Rodríguez, 675 F.3d 48, 64 (1st Cir. 2012). "Even if a defendant can show all of this, we have discretion not to

intervene if we conclude that the error does not distort the fairness or integrity of the lower court proceedings." Id.

On appeal, Alvarado exploits several aspects of Agent León's testimony regarding drug quantity: that he did not know the relative amounts of marijuana, heroin, and cocaine sold at the drug point and could not conclude that crack was the substance most sold; that he was unable to tell whether cocaine or crack was being sold in any given transaction involving a white substance in a transparent baggy; that his surveillance at the drug point was partial and he made no notes; that he relied on unsupported assertions of a cooperating witness that 1,000 baggies were sold each day at the drug point; and that his testimony that 150 transactions occurred per hour was not credible. Additionally, he argues that the video recordings were unreliable and any averages derived therefrom lack empirical underpinnings. Specifically, he claims that, since the video only recorded when there was movement at the drug point, the footage did not represent an entire day's worth of transactions nor did they account for fluctuations because of weather or police activity. Further, it is alleged it was impossible to determine from the recordings what substance was being sold in those transactions. In relying on the videos, Alvarado insists, Agent León made unsubstantiated and conclusory assertions that out of an estimated 150 transactions per hour, 40 involved crack.

Similarly, as to the specific issue of drug quantity, Ramírez also identifies significant flaws with the government's evidence. Ramírez likewise claims that the drug quantity evidence introduced by the Government was unreliable and that his due process rights at sentencing were violated. As to the evidence introduced to determine the proper drug quantity amount attributable to him from the Pámpanos drug point, Ramírez points out that: the videos do not allow for proper differentiation between crack and cocaine sold; the only evidence linking Ramírez to the drug point is based on double hearsay of what one drug gang leader allegedly told Vidro; reliance on information obtained from Vidro was unreliable because his grand jury testimony reflects that he could not remember how many baggies of cocaine were sold at the drug point;[14] the 0.2 gram per baggy figure was based on double hearsay evidence from a laboratory supervisor without production of written laboratory results nor any indication that the laboratory supervisor weighed the drugs personally; and the estimates of average daily amounts sold of 200 grams per day were based on insufficient sampling based only on one day rather than a broader set of days. Further, Ramírez notes the discrepancy between drug

---

[14] In his grand jury testimony, Vidro stated that, "what I can recall is the last day I worked I sold 14 packages of cocaine and each one contained 25 baggies. . . . It was not a very good day, not a bad day. It was just mid week, it was a Wednesday." When asked on which days more drugs were sold at the drug point, Vidro answered, "Fridays and Saturdays."

amounts attributable to various defendants from conduct at the Pámpanos drug point, noting that, in Alvarado's case, the weight determined per baggy was 0.075 grams while in his case, the weight per baggy was 0.2 grams. As to Salistral, Ramírez argues that since no videos were taken at the drug point and no drug quantity determination was made as to that drug point, evidence drawing any drug quantity amount attributable to him is unreliable.

In Harakaly, we affirmed the district court's conviction under the more lenient harmless error standard, and found that notwithstanding the Alleyne error, there was overwhelming evidence of drug quantity sufficient to trigger the heightened penalty provision. Harakaly, 734 F.3d at 96 (finding evidence of drug quantity overwhelming where defendant, at the change of plea hearing, acknowledged the accuracy of an account from a co-conspirator that he had delivered to co-conspirator an amount of drugs far exceeding the triggering amount). Here, the government has marshaled no such evidentiary effort, and Ramírez and Alvarado have accurately and appropriately pointed us to serious flaws in the government's case. Perhaps most telling of all, is the district court's own recognition that the evidence presented by the government at sentencing, was largely hearsay and deficient to the point of trampling due process.

If the Sixth Amendment still allowed the district court to make drug quantity findings for determining mandatory minimums

by a preponderance of the evidence -- without any admission from the defendants -- perhaps my conclusion would differ. However, the Supreme Court has clarified the significance of mandatory minimum sentences under federal law, and, on these facts, I find the majority's view unpersuasive, that the application of Alleyne can be avoided. Accordingly, the error here is plain. Furthermore, given the serious evidentiary weaknesses in the government's case, it is obvious that the conviction rests on evidence that would likely not be admissible had the case, or the element of drug quantity alone, been submitted to a jury. Under these circumstances, the district court's Alleyne error clearly distorted the fairness and integrity of the trial court proceedings. Rodríquez, 675 F.3d at 64.

In Delgado-Marrero, we found reversible error, under plain error review, where the court, after trial and on a special verdict question, failed to instruct the jury that the element of drug quantity was to be determined beyond a reasonable doubt. Delgado-Marrero, 744 F.3d at 188-89. We further noted that, due to the shortcomings of the drug quantity evidence presented by the government, this was not "a case in which the evidence tying the defendant to the charged conspiracy involved drugs that were indisputably in excess of the requisite amounts." Id. at 189. (citations omitted). In Delgado-Marrero, the evidence of drug quantity presented by the government was merely contestable, yet we

found that contestability enough to warrant reversal. In this case, however, the evidence proffered by the government is clearly unreliable and, moreover, likely inadmissible at a jury trial. Therefore, Delgado-Marrero's reasoning on this point is all the more persuasive, on these facts.

As to the proper remedy, our recent decision in United States v. Pena, 742 F.3d 508 (1st Cir. 2014) suggests the way forward. In Pena we found reversible Alleyne error where the defendant pled guilty to an underlying drug offense, and the court later found, by a preponderance of the evidence, that death had resulted from the defendant's drug dealing, thus exposing the defendant to a higher mandatory minimum sentence; an element not pled to nor found by a jury beyond a reasonable doubt. Id. at 514. We remanded for resentencing for the underlying offense only, excluding the "death resulting" charge, and refused to allow the government, in part because of Double Jeopardy considerations, to re-indict Pena and seek a conviction for "death resulting" by way of a special sentencing jury. Id. at 509.

In Pena we recognized that, though perhaps not warranted in every case, a typical solution for an Alleyne error is to remand for resentencing. Id. at 515. We noted that "Post-Apprendi cases are also instructive, because Alleyne is an extension of the Apprendi doctrine" and that the remedy for an Apprendi error is "usually a simple remand to the district court for resentencing."

<u>Id.</u> at 518 (internal quotations and citations omitted).  We further noted that "[e]ven on plain error review, several of our sister circuits likewise held that a remand for resentencing by the district judge on the charge of conviction was required." <u>Id.</u>

Indeed, as noted in <u>Pena</u>, the Second, Sixth, and Tenth Circuits have, on plain error review, remanded for resentencing where, as here, the defendant pled guilty to drug crimes, but not to drug quantity, and the lower court endeavored to make drug quantity findings by a preponderance of the evidence in violation of <u>Apprendi</u>.  <u>Id.</u> at 518 n.12; <u>see also</u> <u>United States</u> v. <u>Doe</u>, 297 F.3d 76, 93 (2d Cir. 2002)(remanding for resentencing, on plain error review, where defendant pled guilty to drug crimes without specified drug quantity and the district court made quantity findings by a preponderance standard); <u>United States</u> v. <u>Campbell</u>, 279 F.3d 392, 397, 402 (6th Cir. 2002)(same); <u>United States</u> v. <u>Cernobyl</u>, 255 F.3d 1215, 1221 (10th Cir. 2001)(same).  I would find this occasion appropriate for following this same path, and would order the district court to re-sentence Ramírez and Alvarado to crimes that require no drug quantity determination.

Contrary to what my brethren suggest, my view of this matter in no way encroaches on a trial court's fact finding function at sentencing.  A trial court's duty, and discretion, to find facts in order to determine a proper sentence under the guidelines remains untouched.  However, "[e]stablishing what

punishment is available by law[,] and setting a specific punishment within the bounds that the law has prescribed are two [very] different things." Alleyne, 133 S. Ct. at 2163 (citation omitted). Courts remain free to determine the appropriate sentence only after, in the absence of a plea of guilty to all elements, a jury has determined the adequate statutory range. The latter, it can no longer do without the factual findings of a jury.

## III. Conclusion

That the new sentences the district court might impose pursuant to my proposed order -- within the twenty year maximum allowed by § 841(b)(1)(C) -- could very well be identical to the one the majority allows to stand today, is irrelevant. Though resentencing might ultimately seem formalistic if the same sentence results, whereas the facts found by the district court here aggravated the legally prescribed range of punishment, the Sixth Amendment has been disregarded. Alleyne, 133 S. Ct. at 2162. Accordingly, I respectfully dissent.